1
2
3
4
5
6
7
8                    IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JOANN GARCIA TREFCER,

12              Plaintiff,                    CIV S-11-1436 GGH

13         vs.

14
     MICHAEL J. ASTRUE,                       ORDER
15   Commissioner of Social Security,

16              Defendant.
     _____/

17

18              Plaintiff seeks judicial review of a final decision of the Commissioner of Social

19   Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB")

20   under Title II of the Social Security Act ("Act").  For the reasons that follow, plaintiff's Motion

21   for Summary Judgment is GRANTED IN PART, the Commissioner's Cross Motion for

22   Summary Judgment is GRANTED in part and DENIED in part, and this matter is remanded to

23   the ALJ for further findings as directed in this opinion.  The Clerk is directed to enter judgment

24   for plaintiff.

25   ///

26   ///

                                                1

BACKGROUND

Plaintiff, born November 10, 1953, applied on April 14, 2008, for disability benefits, with a protective filing date of March 31, 2008. (Tr. at 57, 120.) In her application, plaintiff alleged she was unable to work since December 15, 2007, due to her need to walk with a cane, memory loss, stomach problems and "limited ability to move around." (Id. at 120, 142.) Plaintiff also alleged mental health problems. In a decision dated April 28, 2010, ALJ William C. Thompson, Jr., determined that plaintiff was not disabled. (Id. at 14-24.) The ALJ made the following findings:[1]

///

---

[1] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq. Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. § 1382 et seq. Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A parallel five-step sequential evaluation governs eligibility for benefits under both programs. See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987). The following summarizes the sequential evaluation:

> Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
> Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
> Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.
> Step four: Is the claimant capable of performing his past work? If so, the claimant is not disabled. If not, proceed to step five.
> Step five: Does the claimant have the residual functional capacity to perform any other work? If so, the claimant is not disabled. If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process. Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5. The Commissioner bears the burden if the sequential evaluation process proceeds to step five. Id

1.      The claimant last met the insured status requirements of the Social Security Act on June 30, 2008.

2.      The claimant did not engage in substantial gainful activity during the period from her alleged onset date of December 15, 2007 through her date last insured of June 30, 2008 (20 CFR 404.1571 *et seq.*).

3.      Through the date last insured, the claimant had the following severe impairments: degenerative disc disease of the cervical spine; minimal degenerative spurring of the shoulder; cognitive disorder; bipolar disorder, depressive type; and history of drug and alcohol abuse in purported remission (20 CFR 404.1520©).

4.      Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform medium work as defined in 20 CFR 404.1567©.  She could lift 50 pounds occasionally and 25 pounds frequently.  She could stand and walk in combination at least 6 hours in a workday and sit at least 6 hours in a workday.  She should not have been required to climb ladders, ropes, or scaffolding.  She should not have worked at heights or around hazardous machinery.  She would be limited to work involving simple instructions.

6.      Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on November 10, 1953 and was 54 years old, which is defined as an individual "closely approaching advanced age," on the date last insured.  The claimant subsequently changed category to "advanced age" (20 CFR 404.1563).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant was not under a disability, as defined in the Social Security Act, at any time from December 15, 2007, the alleged onset date, through June 30, 2008, the date last insured (20 CFR 404.1520(g)).

(Tr. at 16-24.)

<u>ISSUES PRESENTED</u>

Plaintiff has raised the following issues: A. Whether the Commissioner's Finding that Plaintiff Retained the Residual Functional Capacity for Medium Work Prior to the Expiration of Her Insured Status, is not Based on Substantial Evidence and is Speculative Without Analytical Foundation; B. Whether the Commissioner Failed to Explain Why he Selectively Relied on Dr. Richwerger's Opinion or the State Agency Psychologist's Opinion; and ©, Whether the Commissioner Failed to Articulate Specific and Legitimate Reasons for Discrediting Dr. Kalman's Opinion

<u>LEGAL STANDARDS</u>

The court reviews the Commissioner's decision to determine whether (1) it is based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in the record as a whole supports it. <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1097 (9th Cir.1999). Substantial evidence is more than a mere scintilla, but less than a preponderance. <u>Connett v. Barnhart</u>, 340 F.3d 871, 873 (9th Cir. 2003) (citation omitted).  It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Orn v. Astrue</u>, 495 F.3d 625, 630 (9th Cir. 2007), *quoting* <u>Burch v. Barnhart</u>, 400 F.3d 676, 679 (9th Cir. 2005).  "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." <u>Edlund v. Massanari</u>, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations

///

4

1  omitted).  "The court will uphold the ALJ's conclusion when the evidence is susceptible to more

2  than one rational interpretation."  Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).

3                                                    ANALYSIS

4          A.  Medium Work

5                  Plaintiff contends that the ALJ's finding that plaintiff could do medium work

6  prior to the expiration of her insured status was not based on substantial evidence and was

7  speculative.

8                  Medium work is defined as "lifting not more than 50 pounds at a time with

9  frequent lifting or carrying of objects weighing up to 25 pounds."  20 CFR §§ 404.1567©;

10  416.967©.  Social Security Ruling 83-10 more specifically outlines the prerequisites of medium

11  work, for which the full range requires "standing or walking, off and on, for a total of

12  approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting

13  or carrying objects weighing up to 25 pounds.  As in light work, sitting may occur intermittently

14  during the remaining time."

15                  Here, the ALJ found that plaintiff could do medium work, based on the evidence

16  as a whole, but with no climbing or working at heights or around hazardous machinery.  She was

17  also limited to work involving simple instructions.  (Tr. at 22.)    The ALJ based this conclusion

18  on the treatment notes and found medium work was not inconsistent with plaintiff's daily

19  activities and social functioning.  (Id.)  The ALJ did find that plaintiff's severe impairments

20  included these physical impairments:  degenerative disc disease of the cervical spine and

21  minimal degenerative spurring of the shoulder.  (Id. at 16.)  In discussing plaintiff's functional

22  capacity, the ALJ explained that although plaintiff had experienced a stroke in 2004 which

23  caused right- sided weakness prior to the onset date, there was no mention of any residual

24  problems from the stroke prior to her date last insured.  (Id. at 16.)  In regard to the severe

25  impairments involving plaintiff's cervical spine and shoulder, the ALJ explained:

26  ///

The claimant has alleged numerous musculoskeletal problems, but has gotten only minimal treatment.  The claimant had an MRI of her cervical spine prior to her alleged onset date, which showed degenerative changes and a moderate broad-based bulge of C5-6 disc with a neural foraminal encroachment on the right. ... She had an x-ray of her left shoulder, also prior to her alleged onset date which showed only minimal degenerative spurring with greater tuberosity of the humerus, but no evidence of a fracture.  The claimant had an x-ray in June 2008 of her hip, which was normal .... Although outside the period of disability, just after her date last insured the claimant reported a pain level of only 1 out of 10 and was cleared for regular work....  The claimant continued to seek physical treatment after her date last insured.  The claimant reported increased problems and limitations with her neck, shoulders, hips, knees, and feet.  However, she did not consistently report these problems until March 2009, several months after her date last insured....  While there is only minimal evidence of cervical problems prior to claimant's date last insured and, in fact, prior to 2009, looking at the evidence in the light most favorable to the claimant, I have accounted for some physical limitations in the residual functional capacity determined in this decision.

(Tr. at 19-20.)  The ALJ went on to explain that he gave significant weight to the DDS statements that there was insufficient evidence of plaintiff's physical impairments; however, in regard to the cervical disc disease and shoulder spurring prior to the date last insured, the ALJ gave the DDS opinion reduced weight because there was some objective evidence of these impairments.  (Id. at 20.)

Plaintiff insists that the ALJ erred in finding she could do medium work, in light of her neck and shoulder severe impairments, and he failed to articulate any evidentiary support for his RFC finding.

In regard to the right-sided weakness as a result of a stroke, the ALJ did discuss it as outlined above.  The record indicates that on June 14, 2007, there was a treatment note indicating a stroke in 2004 that resulted in right-sided weakness.  (Tr. at 457.)  On June 16, 2008, plaintiff reported pain in her right arm, right shoulder[2] and right hip.  At this time, plaintiff reported her pain to be a 10 on a scale from 1 to 10.  (Id. at 366.)  The clinical impression was

---

[2]  The degenerative spurring found to be a severe impairment was in plaintiff's left shoulder.  (Tr. at 375.)

1  hip pain.  (Id. at 367.)  There are no records from the actual stroke, which occurred

2  approximately three years prior to plaintiff's onset date; nor are there treatment records, most

3  likely because any permanent effects of a stroke would not be treatable.  See

4  www.webmd.com/stroke/guide/stroke-treatment-overview.  Treatment notes over the years do

5  not reflect any complaints of right-sided weakness other than the single report on June 16, 2008,

6  as mentioned above.  (Tr. at 342-76, 411-80.)

7           Nor do the medical records reflect much in the way of complaints regarding

8  plaintiff's degenerative disc disease of the cervical spine or shoulder spurring.  The records of

9  San Joaquin General Hospital, and San Joaquin County Correctional Health Services, where

10  plaintiff received much of her treatment, contain only a few records of complaints regarding

11  these impairments, including the visit mentioned above on June 16, 2008, an x-ray of the

12  shoulder on September 20, 2007, before the alleged onset date, which showed minimal

13  degenerative spurring, and a treatment note on August 25, 2008, indicating plaintiff's complaint

14  of "osteoarthritis" and request for an orthopedic referral.  (Id. at 375, 446).  In fact, at her health

15  assessment on July 16, 2008, through San Joaquin County Correctional Health Care, plaintiff

16  was specifically asked about all of her medical conditions, and she did not mention any cervical,

17  shoulder or right-sided weakness problems.  (Tr. at 419.)  At her earlier September 21, 2007,

18  health assessment, prior to her alleged onset date, plaintiff had mentioned only degenerative joint

19  disease as a medical problem.  (Id. at 421.)

20           However, a case analysis by the DDS indicates there was an MRI in February

21  2007 which showed degenerative change and moderate broad based posterior bulge at C5-6 of

22  the cervical spine, with neural foraminal encroachment on the right.  (Tr. at 399.)  The MRI

23  itself, however, is not in the record.

24           Plaintiff references other records from San Joaquin Hospital which indicate

25  treatment for neck problems between March 21 and August 28, 2009; however, these records

26  begin nine months after her date last insured.  (Tr. at 498-521.)  For example, an x-ray of the

1    cervical spine on August 28, 2009, fourteen months after her DLI, indicated "degenerative disc

2    disease at C5-6 and C6-7 with anterior spondylosis, hard disc changes posteriorly particularly at

3    C5-6 with left mild-to-moderate foraminal narrowing and facet arthrosis."  This same record

4    indicated that there had been "further des[s]ic[]ative narrowing of the C5-C6 disc with increased

5    hard disc changes posteriorly and slight increase in the foraminal narrowing on the right," since

6    February 4, 2005.  (Tr. at 499.)  An MRI of the cervical spine on November 5, 2009, indicated

7    "C6-7 small left paracentral protrusion partially effaces the lateral recess where it abuts the

8    exiting left C7 nerve root."  (Tr. at 541.)  There was a disc bulge osteophyte complex at C5-6

9    that did not appear to cause significant stenosis.  (Id.)

10             Plaintiff on March 21, 2009, complained of longstanding neck pain since 1999,

11   and she was seen by an orthopedist on July 22, 2009.[3]  These later records indicate that

12   plaintiff's condition prior to her DLI should have been reviewed more closely by the ALJ.  In

13   particular, the MRI taken a few months before her onset date indicated neural foraminal

14   encroachment.  The later MRI refers to foraminal narrowing, which may be consistent with the

15   earlier MRI.  These records indicate that review of plaintiff's physical condition during the

16   pertinent time period and its effect on her exertional capacity was necessary.  A mere and partial

17   reference to the existence of such important records by the ALJ, with no analysis of their

18   significance to the outcome, eviscerates confidence in the conclusion about medium work.[4]

19   Moreover, the ALJ failed to cite to medical record evidence in support of his finding that

20   plaintiff could do medium work.  The evidence before the court indicates that based on

21   plaintiff's cervical problems, it is possible that she cannot perform medium work.  Because the

22

23        [3]  The orthopedic records indicate that plaintiff complained of right shoulder pain in
     addition to knee pain, but she had full range of motion of the shoulder.  She was diagnosed only
24   with "pes anserine bursitis," but received no diagnosis for the shoulder complaint.  (Tr. at 505.)

25        [4]MRI's are often termed the "gold standard" with respect to diagnosing back/neck
     afflictions.  The pre-DLI MRI referenced in the records demonstrate an potential, objective basis
26   for significant pain.

1 ALJ failed to consider the effect of plaintiff's cervical impairment on her exertional capacity, the

2 case will be remanded for a medical expert review of this issue.

3          Plaintiff also contends that the state agency had attempted to arrange a physical

4 consultative exam on two occasions, but plaintiff "appears to have been incarcerated" on these

5 dates.  After her release, she willingly attended her consultative mental exam, indicating her

6 willingness to attend such appointments.[5]  Defendant, on the other hand, argues that her physical

7 consultative exam was originally scheduled for July 12, 2008, and was rescheduled for August 4,

8 2008, when she did not show up.  She also failed to arrive for the second appointment.  The

9 records reflect that Dr. Nguyen, apparently a DDS examiner, recommended a consultative

10 exam.[6] (Tr. at 400.)  The DDS case analysis, dated February 11, 2009, indicates that the physical

11 RFC was insufficient.  (Tr. at 482.)  On July 16 and August 14, 2008, plaintiff was clearly

12 incarcerated.  (Tr. at 464, 478.)  It is not clear what other dates in July and August 2008 plaintiff

13 was incarcerated.  (Tr. at 460-66.)  Defendant contends that according to plaintiff's own records,

14 she was only incarcerated on July 16, 2008, and August 13, 2008, after these scheduled

15 appointments.  The record cited in support of this contention contains dates of events recorded

16 by San Joaquin Correctional Health Care, but this list does not necessarily comprise all the dates

17 of plaintiff's incarceration, but merely the dates of pertinent medical events.  (Tr. at 416.)

18 Therefore, it is still not clear if plaintiff was incarcerated on June 12 or August 4, 2008.  Plaintiff

19 argues that in any event, the ALJ should have ordered such an exam since plaintiff was no longer

20 incarcerated and now had legal counsel.  It does not appear that plaintiff's counsel requested a

21 ///

---

22
23          [5] A case analysis note indicates that plaintiff's prior CC claim in August 2005 was
denied for failure to go to a CE.  (Tr. at 399.)

24          [6] Plaintiff contends that the record does not contain any non-examining state agency
25 opinions and that the ALJ improperly relied on the opinions of claims examiners; however, the
record indicates that Dr. Harris affirmed the opinion of the claims examiner that the physical
RFC was insufficient.  (Tr. at 482.)  Dr. Nguyen also recommended an independent physical
26 exam after plaintiff failed to appear for her two previously scheduled exams.  (Tr. at 400.)

1 consultative exam since she has been representing plaintiff, and she could have done so as late as

2 the administrative hearing.

3         It is true that plaintiff failed to make two scheduled physical consultative exams,

4 and did not try to reschedule them.  Her attorney also could have sought an exam on her behalf.

5 Nevertheless, the evidence concerning plaintiff's cervical impairment, especially the MRI noted

6 above, warrants review of plaintiff's residual functional capacity.

7         A remand for the purpose of a present-day consultative exam would be difficult at

8 the present time because plaintiff's neck and shoulder problems now are not the same as they

9 were prior to her date last insured.  Nevertheless, if a consultative exam can shed light on

10 plaintiff's condition and residual functional capacity during the pertinent period based on a

11 review of the records before and after that period, the ALJ is permitted to order one in addition

12 to, or in conjunction with, the medical expert review ordered above.

13       B.     <u>Whether the Commissioner Selectively Relied on Dr. Richwerger's Opinion and</u>
                 <u>the State Agency Psychologist's Opinion, and Failed to Include a Proper</u>

14                  <u>Hypothetical to the Vocational Expert</u>

15         Plaintiff next claims that the ALJ erred in relying selectively on the opinions of

16 consulting psychologist, Dr. Richwerger, and non-examining state agency psychologist,

17 Dr. Klein.  Plaintiff notes that these mental health practitioners both found that plaintiff had

18 moderate limitations in completing a normal workday or workweek.  She also points out that

19 Dr. Klein additionally found a moderate limitation in plaintiff's ability to perform work at a

20 consistent pace.  Plaintiff claims that the ALJ failed to include these limitations in the

21 hypothetical to the vocational expert.

22         To the contrary, the ALJ stated in summarizing Dr. Richwerger's opinion,

23 "specifically, [plaintiff] had no impairment in her ability to perform simple and repetitive tasks

24 and maintain regular attendance.  She had only slight impairment in her ability to perform work

25 activities on a consistent basis."  (Tr. at 21.)  In fact, the ALJ also noted that there was minimal

26 mental health treatment in the record during the disability period.  (<u>Id.</u> at 20.)  The ALJ

1   additionally summarized the DDS opinions, including Dr. Klein's, noting that these non-

2   examining specialists found that plaintiff's memory and understanding were adequate, and that

3   she had "sustained concentration, persistence, and pace for simple 1-2 tasks." (Tr. at 22.)  The

4   ALJ added the finding that plaintiff was adequate in social interaction, and could adapt to change

5   in most routine work like settings.  This DDS opinion was confirmed on reconsideration.  (Id.)

6   The ALJ concluded by finding that these opinions, along with Dr. Richwerger's opinion, should

7   be given significant weight.  (Id.)

8           Plaintiff refers to Dr. Klein's Mental RFC in which he checked the box indicating

9   that plaintiff was moderately limited in "the ability to complete a normal workday and workweek

10  without interruptions from psychologically based symptoms and to perform at a consistent pace

11  without an unreasonable number and length of rest periods.  (Tr. at 397.)  In his written

12  functional capacity assessment portion of this form, however, Dr. Klein concluded that plaintiff

13  had an "adequate sustained concentration, persistence, and pace for simple 1-2 step tasks only."

14  (Tr. at 398.)  Dr. Klein's conclusion was that plaintiff could do work involving simple 1-2 step

15  tasks only, and could socially interact and adapt to change in most routine work settings.  (Id.)

16  Therefore, even though Dr. Klein checked the box for a moderate limitation in pace, his

17  functional capacity assessment was that plaintiff had an adequate sustained pace.  This

18  conclusion, along with Dr. Richwerger's opinion of only a slight impairment in ability to work

19  on a consistent basis and no impairment in maintaining regular attendance, were appropriately

20  relied upon by the ALJ.

21          Although both Drs. Richwerger and Klein found that plaintiff was moderately

22  impaired in her ability to complete a normal workday and workweek without interruption, they

23  did not find that plaintiff had moderate limitations in pacing, as noted above.  To the extent that

24  Dr. Klein's check-marked box may have been inconsistent with his RFC assessment,

25  Dr. Richwerger's examining opinion carries more weight and is not internally inconsistent.  He

26  found plaintiff to be slightly impaired in her ability to perform work on a consistent basis, and he

1  also found her to be moderately impaired in her ability to complete a normal workday or

2  workweek without interruption from a psychiatric condition.  (Tr. at 382.) Consistency evokes

3  the manner in which plaintiff can get through a workday or workweek on a sustained basis

4  without having to take breaks or losing endurance.  Plaintiff's ability to get through work

5  without a psychiatric issue interrupting her is a different issue.

6          Plaintiff points to the testimony of the vocational expert in support of her claim

7  that any error was not harmless.  Plaintiff's counsel questioned the VE by asking whether, if

8  plaintiff had moderate limitations in ability to complete a normal work week, *and* moderate

9  limitations in pacing, would that erode the jobs mentioned.  The VE responded that both of these

10  limitations involving an unskilled job would preclude plaintiff from sustained employment. This

11  hypothetical is not supported by the evidence, however.

12          Furthermore, even if the more restrictive limitation is considered in terms of

13  functional capacity, the VE only found a preclusion from sustained employment if *both*

14  limitations, moderate limitation in ability to complete a normal work week, *and* moderate

15  limitations in pacing, were imposed.  (Tr. at 55-56.)  Both Drs. Richwerger and Klein agreed that

16  limitations in plaintiff's pace was only slight and that it was adequate.

17          Assuming *arguendo* that there is an inconsistency in the records, and the more

18  restrictive "moderate" limitation is considered, the ALJ's failure to include it in his hypothetical

19  was proper.  The Ninth Circuit has already held that moderate mental limitations do not even

20  require vocational expert testimony.  Hoopai v. Astrue, 499 F.3d 1071, 1077 (9th Cir. 2007).  In

21  Hoopai, a medical source determined that the claimant was moderately limited in "his ability to

22  maintain attention and concentration for extended periods; his ability to perform activities within

23  a schedule, maintain regular attendance, and be punctual with customary tolerance; and his

24  ability to complete a normal workday and workweek without interruption from psychologically-

25  based symptoms and to perform at a consistent pace without an unreasonable number and length

26  of rest periods."  Id.  After the ALJ utilized the grids at step five to determine that the claimant

1  was not disabled, plaintiff contended on appeal that the ALJ was required to seek vocational

2  expert testimony regarding the limitations assessed. Id. at 1075. The Ninth Circuit rejected this

3  argument, holding that these moderate limitations were not sufficiently severe to prohibit the

4  ALJ from relying on the grids without the assistance of a vocational expert. Id. at 1077. Here,

5  likewise, the ALJ could properly decline to include a moderate mental limitation in regard to

6  ability to complete a workday or workweek without interruption in the hypothetical question.

7       C. Failure to Credit the Opinions of Dr. Kalman

8       Plaintiff contends that the ALJ failed to articulate specific and legitimate reasons

9  for failing to credit the opinion of consulting psychologist Dr. Kalman.

10       The weight given to medical opinions depends in part on whether they are

11  proffered by treating, examining or non-examining professionals. Holohan v. Massanari,

12  246 F.3d 1195, 1201 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).[7]

13  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater

14  opportunity to know and observe the patient as an individual. Id.; Smolen v. Chater, 80 F.3d

15  1273, 1285 (9th Cir. 1996).

16       To evaluate whether an ALJ properly rejected a medical opinion, in addition to

17  considering its source, the court considers whether (1) contradictory opinions are in the record;

18  and (2) clinical findings support the opinions. An ALJ may reject an *uncontradicted* opinion of

19  a treating or examining medical professional only for *"clear and convincing"* reasons. Lester,

20  81 F.3d at 831. In contrast, a *contradicted* opinion of a treating or examining professional may

21  be rejected for *"specific and legitimate"* reasons. Lester, 81 F.3d at 830. While a treating

22

23      [7] The regulations differentiate between opinions from "acceptable medical sources" and
24  "other sources." See 20 C.F.R. §§ 404.1513 (a),(e); 416.913 (a), (e). For example, licensed
psychologists are considered "acceptable medical sources," and social workers are considered
25  "other sources." Id. Medical opinions from "acceptable medical sources," have the same status
when assessing weight. See 20 C.F.R. §§ 404.1527 (a)(2), (d); 416.927 (a)(2), (d). No specific
26  regulations exist for weighing opinions from "other sources." Opinions from "other sources"
accordingly are given less weight than opinions from "acceptable medical sources."

professional's opinion generally is accorded superior weight, if it is contradicted by a supported

examining professional's opinion (supported by different independent clinical findings), the ALJ

may resolve the conflict.  <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing

<u>Magallanes v. Bowen</u>, 881 F.2d 747, 751 (9th Cir. 1989)).  The regulations require the ALJ to

weigh the contradicted treating physician opinion, <u>Edlund v. Massanari</u>, 253 F.3d 1152 (9th Cir.

2001),[8] except that the ALJ in any event need not give it any weight if it is conclusory and

supported by minimal clinical findings.  <u>Meanel v. Apfel</u>, 172 F.3d 1111, 1113 (9th Cir.1999)

(treating physician's conclusory, minimally supported opinion rejected); <u>see</u> <u>also</u> <u>Magallanes</u>,

881 F.2d at 751.  The opinion of a non-examining professional, without other evidence, is

insufficient to reject the opinion of a treating or examining professional.  <u>Lester</u>, 81 F.3d at 831.

Here, the ALJ discounted Dr. Kalman's report because it was internally

inconsistent and not well supported by the medical evidence.  After providing a thorough

summary of this consulting psychologist's November 6, 2009 report, the ALJ explained that the

report contains only minimal objective findings.  (Tr. at 21-22.)  The ALJ noted the report's

finding that "claimant's impairment would not be exacerbated by a routine, repetitive, entry level

job, but then indicates that the claimant would miss work more than 3-4 times a month.  The ALJ

further explained that although Dr. Kalman opined that plaintiff's impairment existed since

1999, this time period was not supported by the medical evidence, or plaintiff's statements to the

Social Security Administration.  (Tr. at 22.)

Compared to Dr. Richwerger, who had diagnosed cognitive disorder, with mild

deficits possibly secondary to history of stroke and seizure and three-day coma; Bipolar II,

depressed; and Cluster B predominately borderline personality traits, Dr. Kalman diagnosed

schizoaffective disorder, PTSD, opioid dependence in full sustained remission, and rule out

---

   [8]  The factors include: (1) length of the treatment relationship; (2) frequency of
examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis;
(5) consistency; (6) specialization. 20 C.F.R. § 404.1527

1    mixed personality disorder with borderline and antisocial traits.  (Tr. at 382, 526.)  Whereas

2    Dr. Richwerger assessed a GAF of 55-60,[9] Dr. Kalman assigned a GAF of 50.  (Id. at 382, 527.)

3              In regard to internal inconsistencies in Dr. Kalman's report, it is true that this

4    psychologist found that plaintiff's impairment would not be exacerbated by a routine, repetitive,

5    simple, entry level job.  (Tr. at 531.)  He also found that her impairments were severe enough to

6    prevent her from working more than three or four times per month.  (Tr. at 532.)  Elsewhere,

7    Dr. Kalman noted that plaintiff could, without significant limitation, understand, remember, and

8    carry out very short and simple repetitive instructions, perform activities within a schedule,

9    maintain regular attendance, sustain an ordinary routine without special supervision, and respond

10   appropriately to changes in the work setting, among others.  (Tr. at 529-31.) Plaintiff was found

11   to be only mildly limited in being able to complete a normal workday and workweek without

12   interruptions form psychological symptoms, and she could work at a consistent pace without an

13   unreasonable number and length of rest periods.  (Id. at 530.)  All of these insignificant to mild

14   limitations were inconsistent with Dr. Kalman's opinion that plaintiff would miss work more

15   than three or four times per month.

16             Plaintiff points out that she was found to be moderately limited in other areas that

17   touch on plaintiff's emotions, such as the ability to get along with the public and coworkers, and

18   accepting instructions and criticism, and these areas of social interaction are probably the basis

19   for Dr. Kalman's finding that plaintiff would miss work a few days per month.  As a result,

20   plaintiff argues, there was no inconsistency in Dr. Kalman's opinion because slight limitations in

21   performing simple tasks involves a different area of functioning than social functioning.

22   Dr. Kalman's report, however, does not state why plaintiff would miss work three or more days

23

24            [9] GAF is a scale reflecting the "psychological, social, and occupational functioning on a
     hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of Mental
25   Disorders 32 (4th ed.1994) ("DSM IV").  According to the DSM IV, a GAF of 51-60 indicates
     moderate symptoms such as flat affect, circumstantial speech, occasional panic attacks, or
26   moderate difficulty in functioning as in few friends or conflicts with peers or co-workers.

per month.  Only if plaintiff's interpretation of the report is accepted would Dr. Kalman's report

be considered consistent.  The ALJ's construction of this report is just as reasonable.

   In any event, the ALJ was permitted to rely on one consultative opinion over

another, especially where Dr. Kalman's opinion was rendered a year and four months after

plaintiff's date last insured, and Dr. Richwerger examined plaintiff only two and a half months

after her date last insured.  It is well established that retrospective opinions are even less

persuasive in the specialty of mental health.  "The opinion of a psychiatrist who examines the

claimant after the expiration of his disability insured status, however, is entitled to less weight

than the opinion of a psychiatrist who completed a contemporaneous exam."  Macri v. Chater,

93 F.3d 540, 545 (9th Cir. 1996); Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir. 1984)

("After-the-fact psychiatric diagnoses are notoriously unreliable"); Weetman v. Sullivan,

877 F.2d 20, 23 (9th Cir.1989) (new medical report following adverse administrative decision

denying benefits carries little, if any, weight) (citing Key v. Heckler, 754 F.2d 1545, 1550 (9th

Cir.1985)).

   The ALJ was entitled to rely on the more timely report of Dr. Richwerger who

thought that plaintiff had no impairment in maintaining regular attendance at work.  (Tr. at 382.)

   In regard to the ALJ's explanation that Dr. Kalman found plaintiff to be impaired

since 1999, the record supports his statement that in her application, plaintiff alleged disability

only since December 15, 2007.[10]  (Tr. at 120.)  The treating mental health records in the file

begin only in June 2006.[11]  (Tr. at 303.)  Furthermore, as pointed out by defendant, plaintiff held

jobs after 1999 when Dr. Kalman opined her limitations began.  She was a drug and alcohol

---

[10]  The ALJ's failure to cite the record to support this statement is of no consequence.  He cited to Exhibit 14F in support of his entire paragraph explaining why he was discounting Dr. Kalman's report, which report was the correct citation.

[11]  Dr. Kalman's report, which states that his record review included records beginning November 26, 2001, is mistaken.  (Tr. at 528.)  The jail records he refers to may appear to state, "11-26-01," but the chart notes surrounding these dates reflect dates close to November 26, 2007.  See e.g., tr. at 437, 450.

counselor from 1993 until November 1, 2000, and she was a certified nurses' assistant from 1982 until 2003.[12]  (Tr. at 149.)

Finally, there is a dearth of mental health treatment records, as the ALJ suggested. He noted that although plaintiff was diagnosed with major depressive disorder and history of drug dependence on June 21, 2006, (Tr. at 296), these records were dated approximately a year and a half prior to her alleged onset date.  (Tr. at 20.)  During the period from October 2006 to October 2008, however, the record indicates minimal treatment.  (Id.)  Although plaintiff was incarcerated during this time and sought treatment for physical problems, there was minimal mental health treatment.  (Tr. at 411-80.)  Plaintiff was prescribed Paxil, but received no other treatment.   (Tr. at 439.)  The ALJ additionally noted that although plaintiff obtained mental health treatment after her date last insured, any diagnosis at that time was not pertinent to the time period at issue, from December 15, 2007, to June 30, 2008.  (Id. at 20.)  The records support these findings.  Plaintiff received treatment from San Joaquin County Mental Health from October 27, 2008, to November 26, 2008, from January 8, 2009, to July 29, 2009, and from November 18, 2009, to November 22, 2009.  (Tr. at 402-07, 483-95, 533-37.)  All of these dates are after the pertinent period.

Therefore, the ALJ's reasons for discounting Dr. Kalman's opinion were specific and legitimate and supported by the record.

///

///

///

///

///

///

---

[12]  There is no explanation for the overlap in time periods for different jobs.

1          <u>CONCLUSION</u>

2          Accordingly, plaintiff's Motion for Summary Judgment is GRANTED in part

3  pursuant to Sentence Four of 42 U.S.C. § 405(g), the Commissioner's Cross Motion for

4  Summary Judgment is GRANTED in part and DENIED in part, and this matter is remanded for

5  further findings in accordance with this order.  The Clerk is directed to enter Judgment for

6  plaintiff.

7  DATED: June 26, 2012

8                                    /s/ Gregory G. Hollows
                              UNITED STATES MAGISTRATE JUDGE
9

GGH/076
10  Trefcer1436.ss.wpd

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26